******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

WHEELABRATOR BRIDGEPORT, L.P. *v.* CITY
OF BRIDGEPORT

WHEELABRATOR BRIDGEPORT, L.P., ET
AL. *v.* CITY OF BRIDGEPORT
(SC 19288)

Rogers, C. J., and Palmer, Zarella, Eveleigh, Espinosa,
Robinson and Vertefeuille, Js.

*Argued September 17, 2015—officially released February 2, 2016*

*John B. Daukas*, pro hac vice, with whom were *Barry C. Hawkins* and *Michael K. Murray*, for the appellants-appellees (plaintiffs).

*Elliott B. Pollack*, with whom was *Tiffany K. Spinella*, for the appellee-appellant (defendant).

*Opinion*

ZARELLA, J. The named plaintiff, Wheelabrator Bridgeport, L.P. (Wheelabrator), operates a waste to energy facility (facility) located on property in the city of Bridgeport (property).[1] In 2009, Wheelabrator appealed from the tax assessment of the defendant, the city of Bridgeport (city), pursuant to General Statutes §§ 12-117a, 12-119 and 22a-270, claiming that the city had overvalued the property, as well as personal property located on the property, on the city's 2007 and 2008 grand lists for purposes of assessing property taxes. In 2011, Wheelabrator, the United States Bank National Association, as corporate owner trustee of the facility, James E. Mogavero, as individual owner trustee of the facility, and Waste To Energy I, LLC (Waste To Energy),[2] as equitable owner of the facility, filed a second appeal from the city's tax assessment, alleging that the city had overvalued the property on the 2010 grand list. Thereafter, the two appeals were consolidated for purposes of trial. The city moved to dismiss both appeals for lack of standing, and the trial court granted the motion to dismiss the first appeal but denied the motion to dismiss the second appeal. The trial court then rendered partial judgment in favor of Wheelabrator in the second appeal and reduced the valuation of the property on the 2010 grand list. Wheelabrator filed the present appeal[3] from the judgments of the trial court, claiming, among other things, that the trial court improperly (1) granted the city's motion to dismiss the first appeal, (2) improperly valued the property in the second appeal, and (3) failed to consider evidence of the city's wrongful conduct in the second appeal. The city cross appealed, claiming that, in the second appeal, the trial court improperly (1) denied its motion to dismiss, (2) admitted the appraisal testimony of Wheelabrator's two expert witnesses, and (3) excluded developer's profit from its valuation of the property based on the cost to construct the facility. We conclude that the trial court improperly dismissed the first appeal. We also agree with Wheelabrator's two claims regarding the second appeal and reject the city's claims on cross appeal. Accordingly, we reverse the judgment of the trial court dismissing the first appeal, reverse the trial court's valuation of the property in the second appeal, and remand for further proceedings in the first appeal and a new trial in the second appeal.

The record reveals the following procedural history and facts, some of which were found by the trial court and some of which are undisputed. The facility was built in the 1980s as a collaboration between the Connecticut Resources Recovery Authority (CRRA) and Wheelabrator. The facility burns municipal solid waste to generate electricity, which Wheelabrator sells to United Illuminating Company. In addition to income derived from the sale of electricity, Wheelabrator receives tip-

ping fees from municipalities in exchange for receiving municipal solid waste.

In order to take advantage of certain tax and bond opportunities that would not have been available if the facility had been owned by a private entity, CRRA took nominal title to the facility and leased it back to Wheelabrator. Pursuant to § 22a-270 (a),[4] the property was exempt from municipal property taxes until January 1, 2009. The property became taxable on that date pursuant to § 22a-270 (b). On the city's 2007 grand list, the city listed the fair market value of the property as $365,624,993 and the value of Wheelabrator's personal property as $17,253,570. These amounts reflected the value of the real and personal property as of October 1, 2003, the date of the last citywide property valuation.

The city conducted a citywide revaluation on October 1, 2008. As the result of this revaluation, the city listed the value of the property on the 2008 grand list as $401,624,570 and the value of Wheelabrator's personal property as $10,559,534. Wheelabrator appealed from the 2007 and 2008 valuations to the Board of Assessment Appeals of the City of Bridgeport (board), claiming that the valuations were excessive.[5] The board denied the appeal. Wheelabrator then appealed from this denial to the trial court pursuant to §§ 12-117a,[6] 12-119[7] and 22a-270 (b). In its complaint, Wheelabrator alleged that, as of December 31, 2008, Waste To Energy was the owner of the property and that Wheelabrator was a lessee that was responsible for paying all property taxes.

Thereafter, the city filed a motion to dismiss the appeal for lack of subject matter jurisdiction on the ground that Wheelabrator lacked standing. Specifically, the city contended, among other things, that Wheelabrator had alleged that Waste To Energy was the owner of the property that Wheelabrator leased when, in fact, CRRA was the owner of the land. Accordingly, the city argued, Wheelabrator "does not have a legally cognizable interest in the subject property from Waste [To Energy]" for purposes of §§ 12-117a and 12-119. See General Statutes § 12-117a ("any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes" has right to appeal from board's ruling); General Statutes § 12-119 ("any lessee [of the property] whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes" has right to appeal from board's ruling). In addition, the city claimed that Wheelabrator lacked standing because a lessee of personal property cannot file an appeal pursuant to §§ 12-117a and 12-119. Wheelabrator filed an opposition to the motion, in which it claimed that, as of January 3, 2009, CRRA held record title to the land on which the facility was located, CRRA leased the land

to Wheelabrator, which subleased it to the United States Bank National Association and Mogavero, the owner trustees, who, in turn, subleased it back to Wheelabrator. In addition, Wheelabrator alleged that the United States Bank National Association and Mogavero, as owner trustees, had record title to the facility and, on behalf of Waste To Energy, which was the trust beneficiary and equitable owner of the facility, leased the facility to Wheelabrator. Wheelabrator also claimed that its standing to appeal pursuant to § 22a-270 did not depend in any way on the nature of Waste To Energy's interest in the land. Rather, that statute was intended to allow lessees such as Wheelabrator to appeal from the city's tax assessments. Finally, Wheelabrator contended that it had standing under §§ 12-117a and 12-119 because it was a lessee of real property whose lease had been recorded in the land records and who was required to pay property taxes, and the statutes were not limited to appeals from real property assessments. The trial court concluded that the issue of Wheelabrator's standing involved factual questions that would be better addressed at the time of trial and denied the city's motion to dismiss.

On its 2010 grand list, the city again listed the value of the real property as $401,624,570, but it reassessed the value of Wheelabrator's personal property at $56,873,060. Wheelabrator appealed from this valuation to the board. At a hearing in this second appeal, the chairman of the board asked Wheelabrator if it had an appraisal report for the property. Wheelabrator had prepared a draft appraisal report for use in the first appeal, but, because the report was not yet subject to disclosure in that litigation under the trial court's discovery schedule, and because Wheelabrator believed that the report was privileged and confidential attorney work product, Wheelabrator declined to produce it. The board ultimately denied the second appeal, and Wheelabrator appealed from the board's denial to the trial court pursuant to §§ 12-117a, 12-119 and 22a-270 (b). The trial court consolidated the two appeals for trial.

At the trial of the consolidated appeals, the city contended that the second appeal should be dismissed for lack of standing because (1) Wheelabrator failed to establish either that CRRA owned the land and that Wheelabrator was its lessee or that the United States Bank National Association and Mogavero, the owner trustees, owned the facility and that Wheelabrator was their lessee, (2) a lessee of personal property is not authorized to appeal pursuant to §§ 12-117a and 12-119, and (3) Wheelabrator failed to exhaust its administrative remedies because it had refused to provide the draft appraisal report to the board at the hearing on the assessment relating to the 2010 grand list. After trial, the trial court granted the city's motion to dismiss the first appeal on the ground that CRRA, not Waste To

Energy, was the owner of the property, and, therefore, Wheelabrator's complaint, "alleging that [Waste To Energy] was the owner and lessor of the subject property, failed to comply with §§ 12-117a and 12-119 [which allow] only an owner of property or a lessee of the owner who has agreed to pay the property tax and whose lease or notice of lease has been recorded [in] the city's land records to appeal from an assessor's valuation."[8] The court further concluded that § 22a-270 did not provide "an alternative path for taking a tax appeal in order to avoid the restrictions contained in §§ 12-117a and 12-119" because § 22a-270 "requires the lessee to comply with chapter 203 of the General Statutes . . . which incorporates §§ 12-117a and 12-119 . . . ." The court implicitly denied the city's motion to dismiss the second appeal.[9]

Turning to Wheelabrator's claim in the second appeal that the city had overvalued the property on the 2010 grand list, the trial court concluded that the proper appraisal method was the reproduction cost approach. The court further concluded that, under that approach, the value of the property for purposes of the 2010 grand list and subsequent years was $314,017,430. In addition, the court found that Wheelabrator had presented no evidence that the city had improperly valued Wheelabrator's personal property at $56,873,060 on the 2010 grand list. The court also noted that "the value of the facility under the cost approach does not include personal property since the cost valuation is not based [on] the valuation of a going concern." Thus, the trial court concluded that the city could impose a separate tax on the personal property. This appeal and cross appeal followed. We address each of the parties' claims in turn. Additional facts and procedural history will be set forth as necessary.

I

We first address Wheelabrator's claim that the trial court improperly granted the city's motion to dismiss the first appeal. We agree with Wheelabrator.

The following facts and procedural history are relevant to our resolution of this issue. As we indicated, the trial court concluded that Wheelabrator lacked standing to bring the first appeal because it alleged in its complaint that Waste To Energy owned the property as of December 31, 2008, and Wheelabrator was its lessee with responsibility to pay all property taxes when, in fact, CRRA was the owner of the land. Accordingly, the trial court concluded that Wheelabrator lacked standing to appeal pursuant to §§ 12-117a and 12-119 because it had failed to plead or to establish that the requirements of those statutes relating to lessees of property had been met. The court further concluded that § 22a-270 (b) did not provide an independent route for Wheelabrator to establish standing because that statute required Wheelabrator to comply with chapter

203 of the General Statutes, including the requirements of §§ 12-117a and 12-119 relating to lessees. Wheelabrator contends, to the contrary, that § 22a-270 (b), standing alone, confers standing on it to appeal from the city's tax assessment. In addition, Wheelabrator contends that, because it was CRRA's lessee, because its leases with CRRA were recorded in the land records, and because it was required under the terms of its leases to pay all property taxes, it had independent standing to appeal pursuant to §§ 12-117a and 12-119.

We begin our analysis with the standard of review. "If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. . . . A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Burton* v. *Dominion Nuclear Connecticut, Inc.*, 300 Conn. 542, 550, 23 A.3d 1176 (2011).

Because it is dispositive, we first address Wheelabrator's claim that it had standing to appeal pursuant to § 22a-270 (b). That statute provides in relevant part: "Notwithstanding the provisions of subsection (a) of this section, real and personal property owned by the authority may be assessed and taxed against a lessee pursuant to chapter 203 by the municipality in which such property is located if such property is leased as of July 1, 2007, to a lessee or operator by the authority pursuant to an initial site lease entered into between the authority and a lessee on or before December 31, 1985. . . . The lessee shall be liable for taxes assessed pursuant to this subsection and shall have the right to appeal the amount it is assessed in the tax year such property first becomes taxable hereunder in the same manner as a purchaser of formerly tax-exempt property under section 12-81a,[10] with the same effect as if a conveyance to a nonexempt purchaser had been placed on the land records on the date the property first ceases to be exempt pursuant to this section. . . ." (Footnote added.) General Statutes § 22a-270 (b).

We conclude that this language clearly and unambiguously confers standing on Wheelabrator to appeal from a property tax assessment. First, the city does not dispute that Wheelabrator is a "lessee" as that term is used in § 22a-270 (b). Rather, the city's primary argument is that, contrary to the allegation in Wheelabrator's complaint in the first appeal, Waste To Energy never was the record title holder or record *lessor* of the property. Nothing in the language of § 22a-270 (b), however, suggests that an entity that indisputably is a "lessee" under the statute cannot appeal from a tax assessment unless it pleads and establishes the identity of the lessor of the property. To the contrary, the statute provides that

a "lessee" has a right to appeal "in the same manner as a purchaser of formerly tax-exempt property under section 12-81a, with the same effect as if a conveyance to a nonexempt purchaser had been placed on the land records on the date the property first ceases to be exempt pursuant to this section." General Statutes § 22a-270 (b). Thus, for purposes of an appeal pursuant to § 22a-270 (b), a lessee is deemed to be the owner of the subject property, and property owners clearly have standing to appeal from property tax assessments. Accordingly, we cannot perceive why an entity that is admitted to be a lessee for purposes of § 22a-270 (b) should be required to plead or prove any additional element to establish standing to appeal from a property tax assessment pursuant to that statute.[11]

We also reject the city's claim that a lessee of *personal* property does not have standing to appeal from the tax assessment of that property pursuant to § 22a-270 (b). Section 22a-270 (b) expressly provides that "real and personal property owned by the authority may be assessed and taxed against a lessee" and that the lessee "shall have the right to appeal the amount it is assessed . . . in the same manner as a purchaser of formerly tax-exempt property under section 12-81a . . . ."[12] Thus, for purposes of an appeal from a tax assessment on personal property pursuant to § 22a-270 (b), the lessee of the property is deemed to be its owner. Accordingly, we conclude that Wheelabrator had standing to bring the first appeal pursuant to § 22a-270 (b), and, therefore, the trial court improperly granted the city's motion to dismiss that appeal.[13]

II

We next address Wheelabrator's claim that the trial court improperly determined the value of the property in the second appeal. Specifically, Wheelabrator contends that the trial court improperly rejected the discounted cash flow approach to valuing the property as a matter of law. We agree with Wheelabrator.

The record reveals the following additional facts and procedural history that are relevant to our resolution of this claim. At trial, one of Wheelabrator's expert witnesses, Alexander L. Hazen, testified that there are three primary methods of appraising property, namely, "the cost approach, [the] income approach, and [the] sales comparison approach, also known as the market data approach." When asked what was the most appropriate approach for waste energy facilities, Hazen responded that "[t]he primary reliance would be on the income approach to value." Hazen explained that a purchaser's "willingness to pay more or less for a facility is going to be based on the income flow that he anticipates into the future." Hazen also explained that, in applying the income approach to the appraisal of the property at issue in the present case, he had reviewed Wheelabrator's financial information and had

projected income streams from sales of electricity and tipping fees for the useful life of the facility. Hazen then converted the value of that future income stream to present value to arrive at the value of the facility, a methodology that is known as the discounted cash flow approach. Hazen concluded that, under this approach, the fair market value of the property as of October 1, 2008, was $199,300,000.

Although Hazen and Joseph Kettell, another expert who testified for Wheelabrator, believed that the discounted cash flow approach was the best approach for appraising the property, they also made calculations pursuant to the replacement cost approach. Hazen testified that they applied this approach "as a check against other approaches to make sure that you're not way off in left field someplace." Hazen and Kettell opined that the replacement cost of the facility as of the revaluation date of October 1, 2008, was $211,300,000. Reconciling this value with the $199,300,000 value based on the discounted cash flow approach, Wheelabrator's experts ultimately concluded that, as of October 1, 2008, the fair market value of the property was $201,700,000. Excluding tax exempt pollution control equipment valued at $10,857,310, the taxable value was $190,842,690.

The city's expert witness, Mark Pomykacz, also testified that he had relied primarily on the income approach to appraising the property and that he had relied on the cost approach only "[i]n a secondary fashion." Pomykacz testified on cross-examination that he had relied primarily on the income approach because that "is the method that the market participants put the most weight on." Similarly, in his written opinion, he stated that "in a deregulated market, the income approach should be utilized and given the greatest weight among the three approaches to value for electric generation facilities," and that "the income approach provides the strongest indication of market value for the [f]acility, as of the valuation dates." He explained that there are two main income approaches, namely, direct capitalization[14] and the discounted cash flow analysis, and that he had used both of them to determine the value of the property. Pomykacz concluded that, as of October 1, 2008, the value of the property under the direct capitalization approach was $398,456,411 and its value under the discounted cash flow approach was $376,184,993, rounded down to $376,180,000.

Pomykacz also testified, however, that the cost approach to property appraisal is "especially informative" for special purpose properties and highly engineered facilities, such as the subject property. He testified that there are two distinct cost approaches, namely, the replacement cost approach and the reproduction cost approach.[15] He further testified that he had been able to find market data that allowed him to apply both cost approaches to the subject property "meaning-

fully and reliably" but that "these conclusions were given less weight than the income approach conclusions." Pomykacz concluded that, as of October 1, 2008, the value of the property under the reproduction cost approach was $362,027,000 and the value under the replacement cost approach was $402,753,000. After reconciling the various approaches, giving special weight to the discounted cash flow approach and subtracting the value of exempt pollution control equipment and nontaxable and tax exempt property, Pomykacz ultimately concluded that the taxable value of the property as of October 1, 2008, was $357,500,000.

The trial court ultimately concluded that "the reproduction cost approach is the only credible approach to use in this case in order to arrive at a [fair market value] of the subject property as of October 1, 2008." Although the court acknowledged that both Wheelabrator's experts and Pomykacz had testified that the discounted cash flow approach was an appropriate method to value the property, the court concluded that this approach "lack[ed] credibility" because, among other reasons, (1) "if the [discounted cash flow]/going concern income approach[16] process were credible, then two experienced and knowledgable appraisers who are given the same basic facts and who use the same income approach would not be over $200,000,000 apart in their valuation of the subject property";[17] (footnote added); (2) "[t]he appraisers employed the going concern approach rather than directly valuing the real and personal property [that] are the subject of the [two] appeals,"[18] and (3) the appraisers' respective valuations of the nontaxable intangible assets were far apart.[19] In addition, the trial court took note of the court's observation in *Tamburelli Properties Assn.* v. *Cresskill*, 15 N.J. Tax 629 (1996), aff'd, 308 N.J. Super. 326, 705 A.2d 1270 (App. Div. 1998), that "the courts have not always discussed the discounted cash flow analysis . . . as a method for arriving at true market value for real estate in the most positive terms. . . . The [discounted cash flow] method, as applied to tax valuation proceedings, is an amalgam of interdependent, attenuated assumptions of limited probative value. Whatever may be its utility in other contexts, its use in [this context] can only be described as an exercise in financial haruspication."[20] (Internal quotation marks omitted.) Id., 643.

After rejecting the other valuation approaches for various reasons,[21] the trial court concluded that "[t]he reproduction cost approach has credibility for purposes of valuing the subject." The trial court then used Pomykacz' historical cost figure of $241,949,000, which excluded developer's profit of 15 percent that Pomykacz had included in his calculations, multiplied this figure by Pomykacz' "trend factor" of 2.08 percent, and applied Pomykacz' 38 percent depreciation factor to arrive at a value of $312,017,430. Because the reproduction cost approach did not include the value of the

land, the court then added the stipulated land value of $2,000,000, for a total taxable value of $314,017,430 as of October 1, 2008.[22] Accordingly, the trial court concluded that, to the extent that the second appeal challenged the city's valuation of the real property on the 2010 grand list as $401,624,570, the appeal was sustained. Because Wheelabrator had presented no credible evidence that the city had improperly determined that the value of its personal property was $56,873,060, however, the trial court denied Wheelabrator's appeal from that valuation. The court rendered judgment in the second appeal for Wheelabrator accordingly.

After Wheelabrator filed the present appeal from the judgments of the trial court, this court ordered the trial court to articulate whether it had rejected the discounted cash flow approach as a method for valuing the subject property as a matter of law, or because it found the testimony of the parties' experts not credible with respect to that approach. The trial court stated that it "did not reject the [discounted cash flow] approach as a method for valuing the subject property as a matter of law" but had "rejected the testimony of the parties' experts because it found this testimony not to be credible with respect to this approach."

Wheelabrator claims on appeal that, notwithstanding the trial court's contention to the contrary in its articulation, the court improperly rejected the discounted cash flow approach to valuing the property as a matter of law. We agree.

Resolving the issue of whether the trial court improperly rejected the discounted cash flow approach to valuing the property as a matter of law requires us to answer two questions. First, we must determine whether the trial court, in fact, rejected the approach as a matter of law. See, e.g., *Redding Life Care, LLC* v. *Redding*, 308 Conn. 87, 102, 61 A.3d 461 (2013) ("the starting point in any tax appeal taken from the Superior Court . . . is a determination as to whether the trial court reached its decision through [1] the exercise of its discretion in crediting evidence and expert witness testimony, or [2] as a matter of law"). Second, if we conclude that the trial court reached its determination as a matter of law, we must decide whether that determination was proper. The first question requires us to interpret the judgment of the trial court, which, itself, is a question of law. See *Ottiano* v. *Shetucket Plumbing Supply Co.*, 61 Conn. App. 648, 651–52, 767 A.2d 128 (2001). "As an issue of law, [t]he interpretation of a judgment may involve the circumstances surrounding the making of the judgment. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment . . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The construction of a judgment is a question of law for the court. . . . As a general rule, judgments

are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . The judgment should admit of a consistent construction as a whole. . . . To determine the meaning of a judgment, we must ascertain the intent of the court from the language used and, if necessary, the surrounding circumstances." (Citations omitted; internal quotation marks omitted.) Id., 652.

We conclude for the following reasons that the trial court rejected the discounted cash flow approach[23] to the valuation of the property as a matter of law. First, the court strongly suggested that it believed that problems with the use of *the approach itself*, rather than flaws in the experts' specific calculations, were responsible for the disparate valuations. Indeed, the court characterized both Kettell and Pomykacz as "two experienced and knowledgable appraisers . . . ." Second, and more to the point, the court's statement that the appraisers had employed a "going concern approach rather than directly valuing the real and personal property" clearly suggests that the court believed that a going concern approach, which the court believed was synonymous with a discounted cash flow approach, was inherently improper and fundamentally incompatible with a property valuation for tax assessment purposes, at least for a property, such as a waste to energy facility, that had no rental market. See footnote 18 of this opinion. Third, the court noted with approval another court's disparagement of the discounted cash flow method as haruspication. See text accompanying footnote 20 of this opinion. Fourth, the trial court never explained why it concluded that the testimony of both Kettell and Pomykacz that the discounted cash flow approach was the best approach to the property valuation at issue *in the present case* was not credible. In other words, the court never explained what it was about the property that led the court to conclude that it was particularly unsuited to valuation under the discounted cash flow approach, despite the testimony by the parties' expert witnesses that it was the most appropriate method for valuing this property.[24] Cf. *Redding Life Care, LLC* v. *Redding*, supra, 308 Conn. 103 (concluding that trial court had not rejected going concern approach as method for valuation as matter of law when "the trial court's disagreement with the plaintiff's valuation turned on the flaws in [the appraiser's] calculations and formula, not on the method itself"). In the absence of any such explanation, we can conclude only that the court determined that the approach was inappropriate in the present case because it believed that it is generally an inappropriate method for valuing property for tax assessment purposes, at least when the property does not have a rental market. Finally, it is significant that, during trial, the trial court had expressed doubts about the general propriety of employing the discounted cash

flow approach to valuing property for property tax assessment purposes. See footnote 18 of this opinion. The court's reference at that time to the pending appeal from its decision in *Redding Life Care, LLC*, supports the conclusion that the court was not concerned with specific flaws in the appraisers' calculations but with the method itself.[25]

We are mindful that the trial court stated in its articulation that it had found the testimony of the parties' experts "not to be credible with respect to this approach." It is clear to us, however, that the trial court rejected the credibility of their testimony that the discounted cash flow approach was a proper method for valuing the property for tax assessment purposes, not that it had rejected the credibility of their actual calculations pursuant to that approach. To be sure, the trial court in its memorandum of decision did criticize several of Kettell's specific calculations. For the reasons that we have explained, however, we cannot conclude that those perceived flaws formed the basis of the trial court's rejection of the discounted cash flow approach. Indeed, although the trial court found that some of Pomykacz' calculations under the reproduction cost approach lacked credibility, the court ultimately based its valuation on that approach. We conclude, therefore, that the trial court rejected the discounted cash flow approach to valuation for property tax assessment purposes—at least as applied to properties that do not have a rental market—as a matter of law.[26]

We next consider whether this determination was proper. "[W]hen a tax appeal . . . raises a claim that challenges the propriety of a particular appraisal method in light of a generally applicable rule of law, our review of the trial court's determination whether to apply the rule is plenary." (Internal quotation marks omitted.) *Redding Life Care, LLC* v. *Redding*, supra, 308 Conn. 101.

In *Redding Life Care, LLC*, we concluded that "[t]here may be cases in which it is proper to value real estate by first valuing the going concern associated with the property, based on an income capitalization approach, and other cases in which it is not." Id., 96 n.9. Although we did not directly address the issues of whether the specific *discounted cash flow* approach to valuing a going concern could be employed for property tax assessment purposes in an appropriate case or whether the general income approach may be employed to appraise property that does not have a rental market, we can perceive no reason why those approaches should be categorically barred. Indeed, in the present case, expert witnesses for both sides, whom the trial court characterized as "experienced and knowledgable," testified that the income approach, and, more specifically, the discounted cash flow approach, was the *best* method for valuing the property, because that

is the method that market participants would use to determine the price that they would pay for the property. We conclude, therefore, that the trial court improperly rejected the discounted cash flow approach to valuing the property for tax assessment purposes as a matter of law.

Wheelabrator contends that, if we find that the trial court improperly rejected the discounted cash flow approach to the valuation of the property for tax assessment purposes as a matter of law, this court should adopt the value that Wheelabrator's expert witnesses placed on the property, or, alternatively, we should remand the case to the trial court and direct that court to apply the discounted cash flow approach to the valuation of the property. We conclude that neither of these remedies is appropriate. Specifically, we cannot adopt the valuation of Wheelabrator's experts because doing so would require us to find facts and make credibility determinations, which are not within the province of an appellate court. Similarly, because we have concluded only that the trial court improperly determined that the discounted cash flow approach *cannot be* employed in the present case as a matter of law, not that it *must be* employed as a matter of law, it would be inappropriate for us to direct the trial court to apply the discounted cash flow approach on remand.[27] Accordingly, we conclude that the case must be remanded to the trial court for a new trial at which the court may exercise its discretion to determine the credibility of the expert witnesses regarding the appropriate valuation method, as well as the credibility of their specific calculations. We note, however, that the city does not challenge on appeal the trial court's determination that the property was overvalued on the 2010 grand list. See *Sibley* v. *Middlefield*, 143 Conn. 100, 105, 120 A.2d 77 (1956) ("The court performs a double function on an appeal from a board of tax review. First, it must determine the judicial question [of] whether the appellant has been aggrieved by such action on the part of the board as will result in the payment of an unjust and, therefore, a practically illegal tax. [Second], if that question is answered in the affirmative, the court must proceed to exercise its broad discretionary power to grant relief."). Accordingly, although we conclude that the trial court improperly valued the property, to the extent that the trial court concluded that Wheelabrator was subjected to an unlawful tax as a result of the valuation on the 2010 grand list, we uphold that conclusion and affirm that portion of the judgment of the trial court in the second appeal.

### III

We next address Wheelabrator's claim that the trial court's valuation of the real and personal property on appeal effectively permitted the city to impose a double tax on the value of the personal property.[28] Specifically,

Wheelabrator contends that the trial court incorrectly determined that Pomykacz' appraisal pursuant to the reproduction cost approach—on which the trial court had based its valuation—did not include the value of the personal property and, therefore, that the city could impose a separate tax on the assessed value of the personal property. We conclude that, in light of our remand for a new trial, there is no need for this court to decide whether the trial court's valuation based on Pomykacz' appraisal included the personal property, but the trial court on remand must determine whether the experts' appraisals of the property include the value of the personal property and allocate the taxes on the real and personal property accordingly.

The following facts and procedural history are relevant to our resolution of this claim. At trial, Wheelabrator contended that, because the personal property and the real property were subject to the same tax rate, it could combine the two types of property into a single asset for appraisal purposes. It further contended that, if the court disagreed with this contention, the court could subtract its experts' valuation of the personal property at $54,546,583 from the total combined value of $201,700,000 to reach a real property value of $147,153,417.

Pomykacz testified that he believed that the total value of Wheelabrator's taxable property as of October 1, 2008, was $357,500,000 and that he was not asked to value the real and personal property separately. In addition, he stated in his written report that "[t]he overall value . . . considering the three general appraisal approaches [i.e., the cost approach, income approach and comparable sales approach] includes real property, personal property, intangibles, and taxable and nontaxable property." Although it appears that Pomykacz deducted the value of working capital and business intangibles from the overall value to determine the total taxable value of the property in his written report, it does not appear that he deducted the value of personal property.

The trial court concluded that Pomykacz' valuation pursuant to the reproduction cost approach did not include the value of personal property because "the cost valuation is not based [on] the valuation of a going concern." The court further concluded that Wheelabrator had not presented any evidence that would undermine the city's valuation of the personal property at $56,873,060 on the 2010 grand list. Accordingly, the court concluded that the city could impose a separate tax on the personal property based on that value and rejected Wheelabrator's appeal from that valuation.

Whether the city's valuation of the real property on the 2010 grand list included the value of the personal property is a question of fact subject to review for clear error. See, e.g., *Newbury Commons Ltd. Partnership*

v. *Stamford*, 226 Conn. 92, 103, 626 A.2d 1292 (1993) ("[w]hether a property has been overvalued for tax assessment purposes is a question of fact for the trier"). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State* v. *Maurice M.*, 303 Conn. 18, 51, 31 A.3d 1063 (2011).

We cannot conclude that the trial court's finding in the present case that the valuation of the personal property on the 2010 grand list at $56,873,060 was not excessive was clearly erroneous. Indeed, Wheelabrator does not seriously contend that it was. The fact that the city properly valued the personal property on the 2010 grand list does not mean, however, that Pomykacz' appraisal of the property pursuant to the reproduction cost approach did not include the value of that personal property, and the city has pointed to no evidence that would support the trial court's finding to that effect. Nevertheless, because we have concluded that this case must be remanded to the trial court for a new trial on the value of the property, there is no need for us to decide whether the trial court's finding that Pomykacz' appraisal pursuant to the reproduction cost approach did not include the value of personal property was clearly erroneous.[29] Rather, we conclude that the court on remand must carefully consider whether the appraisers' valuations pursuant to the various approaches include the value of personal property, and, if it finds that they do, the court either should deduct the value of the personal property from the overall value and order the city to tax the real and personal property separately, or should limit the city to taxing the overall value of the property.

IV

Because it is likely to arise on remand, we next address Wheelabrator's claim that the trial court improperly excluded evidence of the city's wrongful conduct and discounted evidence of wrongful conduct that Wheelabrator did present. Wheelabrator contends that the trial court should have considered evidence that the city wrongfully (1) fabricated its valuation of the property, (2) assessed taxes on tax exempt pollution control equipment, (3) imposed an interest penalty, (4) imposed a double tax on personal property, and (5) punished Wheelabrator for refusing to produce its experts' appraisal report at the hearing before the board in the administrative appeal from the assessment on the 2010 grand list. We conclude that, on remand, the trial court may properly consider evidence that the city engaged in wrongdoing for the purpose of determining whether Wheelabrator is entitled to interest on overpayments to the city.

The following additional facts are relevant to our resolution of this issue. In support of Wheelabrator's claim that the city fabricated its valuation of the property, Wheelabrator's plant manager, Vincent P. Langone, Jr., testified at trial that, after the legislature enacted § 22a-270 (b) in 2007; see Public Acts 2007, No. 07-255, § 3; he met with city officials to discuss Wheelabrator's potential property tax liability. John M. Fabrizi, the then mayor of Bridgeport, initially indicated that he believed that the figure would be between $10 and $13 million. At a later meeting, the city's comptroller, Michael Feeney, told Langone that he could not provide a precise figure because the city's fiscal budgets were not yet established but that he believed that the annual property tax would be in the range of $7 to $10 million. Langone told Feeney that, on the basis of third-party appraisals that Wheelabrator had obtained, he believed that annual property taxes would be less than $5 million.

Wheelabrator also attempted to present evidence that, when the city revalued the property in 2008, the city's tax assessor, William O'Brien, was aware that CRRA had obtained an appraisal that put the value of the property at $225 million. The trial court sustained the city's objection to the admission of the appraisal on relevance grounds, but it allowed O'Brien to testify as to whether he was aware of the appraisal at the time of the revaluation. O'Brien testified that he did not know whether he was aware of the appraisal.

In addition, Wheelabrator attempted to present evidence regarding the city's normal procedure for valuing commercial property for tax assessment purposes. That evidence would have shown that the city had hired an appraiser, Vision Government Solutions, Inc. (Vision), to value the city's taxable properties for purposes of the 2008 revaluation. The city provided Vision with field cards for each property. At that point, a Vision employee would go into the field, inspect the property and make any necessary changes on the card. Normally, the various values shown on the card will add up to the total appraised value. The city objected to this evidence on the ground that it was irrelevant with respect to how the revaluation was conducted and contended that the sole issue was whether Wheelabrator could establish that the fair market value of the property was less than the city's valuation. Wheelabrator contended that it was entitled to put on evidence that the city had wrongfully failed to assess the property based on its "true and present value." The trial court sustained the city's objections, stating that "[t]he assessor is really not on trial. This whole issue that the court sees is the question of what's the fair market value of the subject property on the date of valuation." Although the trial court allowed Wheelabrator to submit evidence that the numbers on the field card for the subject property for the 2008 revaluation did not add up to the total appraised parcel

value of $401,624,570,[30] it sustained the city's objection to the admission of evidence showing that the city had told Vision that it would handle the valuation of the property and that the reason the figures on the field card for the property did not add up was because someone had overridden the computer system that generated the various amounts shown on the field cards. Wheelabrator contends that all of this evidence was relevant to show that the city fabricated the $401,624,570 valuation so that it could charge Wheelabrator $13 million per year in taxes and thereby cover its annual budget deficit.

In support of its claim that the city improperly had denied Wheelabrator's claim for an exemption for pollution control equipment valued at $10,559,534, Wheelabrator presented evidence that, in October, 2008, it filed a form seeking a tax exemption for certain pollution control equipment. The city denied the exemption and taxed Wheelabrator for the equipment for two years. Although the city ultimately acknowledged that the pollution control equipment was not taxable, it refused to refund the taxes that it already had collected.

In support of its claim that the city wrongfully had subjected the facility's personal property to double taxation on the 2010 grand list, Wheelabrator presented evidence that it had sent a letter to the city on October 30, 2009, stating that the value of the personal property should be deducted from the $401,624,570 property value shown on the assessor's field card. In response, the city continued to value the real property at $401,624,570 on the 2009 grand list and imposed a separate tax on the personal property listed in Wheelabrator's declaration, which it valued at $55,333,667. On the 2010 grand list, the city valued the real property at $401,624,670 and valued the personal property at $56,873,060.

In support of its claim that the city wrongfully had imposed an interest penalty, Wheelabrator presented evidence that the city sent the first property tax bill to CRRA on January 1, 2009. After Wheelabrator requested a copy of the bill, the city sent it a copy on February 4, 2009. Although Wheelabrator paid the bill within thirty days, as permitted under General Statutes § 12-81a (e),[31] the city imposed a late fee.

In support of its claim that the city wrongfully had punished Wheelabrator for declining to produce its appraiser's report at the hearing before the board in Wheelabrator's administrative appeal from the assessment based on the 2010 grand list,[32] Wheelabrator presented evidence that it declined to produce the report at that hearing because it believed that it was privileged work product. On April 26, 2011, the city sent a letter to Wheelabrator stating that, "[i]n accordance with [General Statutes §] 12-111 . . . and your failure to cooperate with the [b]oard by not giving us a copy of the appraisal you had done, you are hereby notified

that [the] new assessment on the 2010 [g]rand [l]ist has been changed [from $281,137,210] to $282,229,170.”[33] Approximately two weeks later, the city sent Wheelabrator a second, similar letter directing it to disregard the first letter and indicating that the assessment was now $282,453,910. On July 5, 2011, Wheelabrator received a property tax bill showing that the assessed value of the property was now $285,278,449 and that the total tax due for 2011 was $11,308,437.72. In December, 2011, Wheelabrator received another bill showing that the assessed value of the property had been reduced to the original amount of $281,137,210, but the total tax due for 2011 was still $11,308,437.72.

We begin our analysis of Wheelabrator’s claim with the standard of review. Whether the wrongfulness of the city’s conduct is a proper consideration in a property tax appeal pursuant to §§ 12-117a and 12-119 is a matter of statutory interpretation over which our review is plenary. See, e.g., *Carmel Hollow Associates Ltd. Partnership* v. *Bethlehem*, 269 Conn. 120, 129, 848 A.2d 451 (2004). “The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.” (Internal quotation marks omitted.) Id.; see also General Statutes § 1-2z.

Pursuant to § 12-117a, a trial court “shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable, and, if the application appears to have been made without probable cause, may tax double or triple costs, as the case appears to demand; and, upon all such applications, costs may be taxed at the discretion of the court.” In addition, the court “shall, in event of [finding] overpayment, enter judgment in favor of [the] applicant and against [the] city . . . together with interest and any costs awarded by the court.” General Statutes § 12-117a. Pursuant to § 12-119, when the trial court determines that a property tax “laid on property was computed on an assessment which, under all the circumstances, was manifestly excessive and could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of such property,”[34] the court “shall have power to grant such relief upon such terms and in such manner and form as to justice and equity appertains, and costs may be taxed at the discretion of the court.”

In addition to relying on these statutes, Wheelabrator contends that, as a general rule, the trial court should award interest to a plaintiff when the defendant has wrongfully withheld money. Cf. *Loomis Institute* v. *Windsor*, 234 Conn. 169, 181, 661 A.2d 1001 (1995)

("[w]e have construed [General Statutes § 37-3a] to make the allowance of interest depend [on] whether the detention of money is or is not wrongful under the circumstances" [internal quotation marks omitted]); see also *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 310 Conn. 38, 52, 74 A.3d 1212 (2013) ("the wrongful detention standard of § 37-3a is satisfied by proof of the underlying legal claim, a requirement that is met once the plaintiff obtains a judgment in his favor on that claim"). Accordingly, Wheelabrator argues, the trial court improperly excluded and failed to consider evidence of the city's wrongdoing on the ground that the only issue before the court was the fair market value of the property, not whether the city had wrongfully arrived at its valuation or charged Wheelabrator for improper amounts. Specifically, Wheelabrator contends that the city's wrongdoing was relevant because, if wrongdoing had been found, it could have justified an award of interest and costs.

We agree with Wheelabrator that the issue of the city's wrongdoing is a proper consideration in a property tax appeal pursuant to §§ 12-117a and 12-119. In *Loomis Institute* v. *Windsor*, supra, 234 Conn. 169, this court held that an award of statutory interest pursuant to § 37-3a[35] in a tax appeal pursuant to § 12-119 was "primarily an equitable determination and a matter lying within the discretion of the trial court." Id., 181. In support of our conclusion that the trial court in that case had not abused its discretion when it denied an award of interest, we observed that there was "no evidence that the town acted maliciously or in bad faith toward the taxpayer." Id. Thus, we implicitly recognized that malicious or bad faith conduct could support an award of interest.

In *Sears, Roebuck & Co.* v. *Board of Tax Review*, 241 Conn. 749, 766, 699 A.2d 81 (1997), this court held that, in a property tax appeal pursuant to § 12-117a, the trial court has discretion to award interest pursuant to § 37-3a, which establishes the maximum interest rate that the trial court may award. We stated that "[a] trial court acting pursuant to § 12-117a has broad discretion to award interest up to [the] maximum rate" and that, "[i]n exercising this equitable authority, a trial court may consider all relevant information . . . ." Id. We can perceive no reason why the city's wrongdoing should not be a consideration in making this determination.[36] Indeed, we have held that the detention of money may be deemed wrongful for purposes of awarding interest pursuant to § 37-3a even if the liable party had a good faith basis for nonpayment. See *Sosin* v. *Sosin*, 300 Conn. 205, 229, 14 A.3d 307 (2011). Thus, when a defendant's conduct was in bad faith, as Wheelabrator contends, an award of interest may be justified. Accordingly, we conclude that, on remand, Wheelabrator should be entitled to present evidence that the city's overvaluation of the property was the result of wrong-

doing. We emphasize, however, that we express no opinion as to the admissibility of the specific evidence on this issue that the trial court excluded at the first trial, which may be inadmissible on relevancy or other grounds, or as to the relevance of the specific admitted evidence that, according to Wheelabrator, supported a finding of wrongdoing. We conclude only that evidence of wrongdoing is not irrelevant as a matter of law as to the issue of an award of interest.

V

We next address the city's claim on cross appeal that the trial court improperly denied its motion to dismiss the second appeal because Wheelabrator declined to provide the board with its draft appraisal at the April 4, 2011 hearing before the board on Wheelabrator's administrative appeal. The city notes that, pursuant to General Statutes § 12-113,[37] "[a] board of assessment appeals shall not reduce the valuation or assessment of property on the grand list belonging to any person who does not appear at a hearing before the board of assessment appeals, either in person or by such person's attorney or agent, and offer or consent to be sworn before it and answer all questions touching such person's taxable property situated in the town." The city contends that Wheelabrator's refusal to comply with the board's request for a copy of the draft appraisal was the effective equivalent of failing to appear before the board and to answer its questions. Accordingly, the city argues, it could not sustain Wheelabrator's appeal and reduce the valuation of the property, and, therefore, Wheelabrator could not be aggrieved by the board's decision. Because Wheelabrator was not aggrieved, the city further argues, the trial court lacked jurisdiction over Wheelabrator's appeal from that decision. We disagree.

The following facts and procedural history are relevant to our resolution of this claim. The board conducted a hearing on Wheelabrator's appeal from the city's valuation of the property on the 2010 grand list on April 4, 2011. At the beginning of the hearing, the chairman of the board, Richard DeParle, asked Wheelabrator's attorney to "furnish [it] . . . with all documentation which you believe supports your position that the real and personal property [at issue] . . . should be valued at the market value you state in your appeal. You can also furnish testimony to supplement this documentation." Wheelabrator's attorney indicated that, among other documentation, he had a sworn affidavit from Robert H. Pedersen, Wheelabrator's regional comptroller, regarding the total value of the property. He also indicated that Pedersen, who was present, would be willing to testify as to his opinion of the value of the property and to answer the board's questions. DeParle then asked whether Wheelabrator's attorney ever had had the property appraised. When counsel

indicated that he had obtained a draft appraisal of the property for use in the first appeal, DeParle asked whether he was prepared to provide the board a copy of the appraisal. Counsel responded that the appraisal report was subject to a discovery order in the pending first appeal, and that Wheelabrator did not want to produce it because it contained confidential information and it had not yet entered into a confidentiality agreement with the city. DeParle then stated that, "[w]ithout an outside appraisal done for us, there's not a lot more we can do with it," and concluded the hearing.

We begin with the standard of review. As we previously indicated, "[i]f a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. . . . A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Burton* v. *Dominion Nuclear Connecticut, Inc.*, supra, 300 Conn. 550.

This court previously has rejected a claim that was identical to the city's claim in all relevant respects. In *Morris* v. *New Haven*, 77 Conn. 108, 58 A. 748 (1904), the plaintiff brought an action against the defendant, claiming that its assessment of her property was illegal. The defendant demurred to the plaintiff's claim on the ground that, after the plaintiff appealed to the "board of relief," she had failed to appear before that board as required by the predecessor to § 12-113, and the trial court sustained the demurrer. Id., 109. On appeal, this court held that, "[w]aiving the question as to what effect a failure to pursue an appeal before the board of relief may have [on] the relief [that] the Superior Court may properly grant, the mere failure to appear cannot . . . deprive the applicant of her right to be heard [on] the claimed illegality of this assessment. The appeal presented to the board of relief primarily a question of law, viz. does the statute directing the assessors, when a taxpayer refuses to return a list to them as required by law, to make out a list for him and to add to that list an amount equal to [10 percent] of their valuation, authorize them to make such an addition to the list of the applicant under the circumstances of this case? [On] that question the applicant is entitled to a decision of the Superior Court, after the action of the board of relief has made the alleged[ly] illegal assessment binding [on] her, and it is immaterial, as affecting this right, what reason may have induced the board to take the action it did." Id. But cf. *Wilcox* v. *Madison*, 103 Conn. 149, 156, 130 A. 84 (1925) (board of relief properly declined to consider reducing valuation of plaintiff's property when plaintiff failed to appear before board and to answer its questions, and trial court's conclusion that board of assessors had properly considered value

of property as house lots in determining its value for tax purposes was supported by evidence).[38] Thus, in the present case, even if we were to agree with the city that Wheelabrator's refusal to provide the board with a copy of its draft appraisal report was the effective equivalent of a failure to appear before the board and to answer its questions—an issue on which we express no opinion—under *Morris* and *Wilcox*, that failure would go, at most, to the merits of the trial court's decision sustaining Wheelabrator's appeal and would not deprive the trial court of jurisdiction to hear the appeal.[39] Accordingly, we reject this claim.

VI

Because it is likely to arise on remand, we next address the city's claim on cross appeal that the trial court improperly admitted the appraisal testimony of Wheelabrator's expert witnesses on the ground that they were not licensed real estate appraisers in this state. We disagree.

The following additional facts and procedural history are relevant to our resolution of this issue. Before trial, the city filed two motions in limine to preclude the admission of Kettell's and Hazen's testimony and any appraisal report prepared by them. The city contended that Kettell and Hazen, by preparing an appraisal report for the property, had violated General Statutes (Rev. to 2011) §§ 20-501 (a)[40] and 20-523,[41] and any opinion testimony about the value of the property at trial also would violate those statutes. The trial court apparently did not rule on those motions. After trial, the city filed a motion to strike Kettell's and Hazen's testimony and their report for the same reasons. The trial court concluded that, as long as Hazen and Kettell qualified as experts in the appraisal of real estate, no other qualification to testify in court was required. Accordingly, it denied the city's motion to strike. The city now challenges that ruling.

We begin our analysis with the standard of review. "The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused or the error is clear and involves a misconception of the law. . . . Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Citations omitted; internal quotation marks omitted.) *State* v. *Kemp*, 199 Conn. 473, 476, 507 A.2d 1387 (1986), overruled in part on other grounds by *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012).

The Appellate Court repeatedly has rejected the claim

that the city has raised. One of the relevant cases, *Taylor* v. *King*, 121 Conn. App. 105, 109, 994 A.2d 330 (2010), involved a construction contract dispute between the plaintiff homeowner and the defendant contractor. The plaintiff indicated that he intended to call a realtor as an expert witness to testify about the value that his residence would have had if it had been properly constructed and the value that it had as it was actually constructed. Id., 118–19. The defendant moved to preclude the realtor's testimony on the ground that he was not a licensed real estate appraiser. See id. The trial court denied the motion. Id., 119. On appeal, the Appellate Court concluded that the fact that the realtor was prohibited from engaging in real estate appraisal pursuant to General Statutes (Rev. to 2007) § 20-501 did not mean that he was precluded "from testifying as to his opinion of the diminution in value of the plaintiff's property, where the trial court found that the witness' education, training and experience qualified him to testify as an expert . . . ." (Internal quotation marks omitted.) Id., 120. The court further concluded that testifying as to the value of property did not constitute " 'engaging in the real estate appraisal business' " for purposes of General Statutes (Rev. to 2007) § 20-500 (5).[42] Id.; see also *Hutchinson* v. *Andover*, 49 Conn. App. 781, 788–89, 715 A.2d 831 (1998) (General Statutes [Rev. to 1997] § 20-501 did not preclude witness from testifying as to his opinion of value of property when trial court had determined that he was qualified as expert);[43] *Conway* v. *American Excavating, Inc.*, 41 Conn. App. 437, 448–49, 676 A.2d 881 (1996) ("[e]xcept in malpractice cases, it is not essential that an expert witness possess any particular credential, such as a license, in order to be qualified to testify, so long as his education or experience indicate[s] that he has knowledge on a relevant subject significantly greater than that of persons lacking such education or experience"); *Lance* v. *Luzerne County Manufacturers Assn.*, 366 Pa. 398, 403, 77 A.2d 386 (1951) ("[A]n expert is one who qualifies as such by reason of special knowledge and experience, and it is quite obvious that an individual may possess knowledge and experience of a special nature whether or not he is authorized to practice in his special field by virtue of any restriction or licensing requirement imposed by law. The inquiry by the trial judge . . . as to qualifications, therefore, should be whether . . . the witness possesses the special knowledge and experience. As a result of this inquiry, usually conducted as examination and cross-examination by the respective counsel, the . . . trial judge may reach the conclusion that the witness does not possess the requisite qualifications entitling him to be classed as an expert, but the test must be as to the alleged expert's possession of knowledge and experience and not of a piece of paper [that] authorizes him to practice a profession." [Internal quotation marks omitted.]).

We agree that a person who otherwise would be qualified as an expert witness to testify regarding the value of real property is not disqualified merely because the person is not a licensed real estate appraiser in this state. As we have explained, whether a person is qualified to testify as an expert witness in a judicial proceeding turns on whether the person has special skills and knowledge that will shed light on an issue that is beyond the ken of the ordinary juror or trial judge. See *State* v. *Kemp*, supra, 199 Conn. 476. The trial court is presumed to have the skills and experience to make this determination, as with any other expert witness, with the assistance of the parties in an adversarial process. See *Blanchard* v. *Bridgeport*, 190 Conn. 798, 808, 463 A.2d 553 (1983) ("[t]he qualifications of an expert presents a preliminary question for the trial judge"). Moreover, once the trial court has made that determination, the expert witness will be required to testify under oath to ensure that he or she testifies truthfully.

In contrast to the evidentiary and procedural rules governing expert testimony, the purpose of the statutory scheme governing the licensure of real estate appraisers is to protect members of the general public—who do not have the skills and experience of a trial judge to assess a person's competence to determine the value of real estate, and who do not have access to the tools of discovery and cross-examination under oath to assist them in making that assessment or in assessing the person's honesty—by requiring persons who wish to engage in the business of real estate appraisal first to establish their competence and honesty. See General Statutes (Rev. to 2011) § 20-509 (a) ("[c]ertifications, licenses, limited licenses and provisional licenses under sections 20-500 to 20-528, inclusive, shall be granted only to persons who bear a good reputation for honesty, truthfulness and fair dealing and who are competent to transact the business of a real estate appraiser in such manner as to safeguard the interests of the public"); General Statutes (Rev. to 2011) § 20-510 ("[i]n order to determine the competency of any applicant for a real estate appraiser's certification or license, the [Connecticut Real Estate Appraisal] [C]ommission shall, and, in the case of an applicant for a provisional license, may subject such applicant to personal written examination as to the applicant's competency to act as a real estate appraiser"). In our view, nothing would be gained by barring a person who is qualified to assist the finder of fact in a judicial proceeding in its determination of the true and actual value of real property from doing so merely because the person is not licensed. Doing so would advance neither the truth-finding function of the judicial process nor the consumer protection purpose of the statutory licensing scheme.

The city claims, however, that a person who does not have a license to appraise real estate cannot testify in court as an expert witness as to the valuation of real property because such conduct would subject the person to fines and imprisonment pursuant to § 20-523. We disagree. We see no evidence that the legislature had any intention of interfering with the judicial fact-finding function by authorizing the prosecution of such conduct, which, as we have explained, would in no way undermine the primary purpose of the statutory licensing scheme—to protect members of the public from unscrupulous and incompetent real estate appraisers. We further note that an interpretation of § 20-523 that would allow the prosecution of a person who has assisted the fact finder in judicial proceedings by testifying as an expert witness as to the value of real property would raise serious constitutional questions under the separation of powers doctrine.[44] See *State* v. *Clemente*, 166 Conn. 501, 514, 353 A.2d 723 (1974) ("courts have an inherent power, independent of statutory authorization, to prescribe rules to regulate their proceedings and [to] facilitate the administration of justice as they deem necessary"); see also *State* v. *Cook*, 287 Conn. 237, 245, 947 A.2d 307 ("[i]t is well established that this court has a duty to construe statutes, whenever possible, to avoid constitutional infirmities" [internal quotation marks omitted]), cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). Accordingly, we agree with the Appellate Court that, for purposes of General Statutes (Rev. to 2011) § 20-500 et seq., testifying in court regarding the value of real property does not constitute "engaging in the real estate appraisal business" for purposes of the statutory scheme. (Internal quotation marks omitted.) *Taylor* v. *King*, supra, 121 Conn. App. 120, quoting General Statutes (Rev. to 2007) § 20-500 (5). Rather, such conduct constitutes the provision of forensic services by an expert witness. We therefore reject this claim.

## VII

Finally, because it may arise on remand, we address the city's claim that the trial court abused its discretion when it excluded developer's profit from its reproduction cost calculations in determining the value of the property. We disagree.

The following facts and procedural history are relevant to our resolution of this claim. In his appraisal report, Pomykacz explained that he was "provided with a copy of [an] [a]mendment . . . to the Solid Waste Disposal Agreement dated May 1, 1988. On page 7 of the [a]mendment, it can be seen that the aggregate historical cost basis of the [f]acility is $241,949,000. We then added 15 percent of the historical cost basis for developer's profit. Developer's profit is the profit that a developer expects to earn from the development of the project. Even a developer/owner who intends to

continue to own and manage the property after construction has an expectation of some profit on the development of the property; otherwise [the] owner would simply purchase an existing property instead of going through the effort and risk of building a new one."

The trial court concluded that "Pomykacz' inclusion of a developer's profit of 15 [percent] of the historical cost lacks credibility. It is logical to assume that when the original facility was constructed, all costs, including a developer's profit, would have been included in the historical costs." Accordingly, the trial court excluded the 15 percent developer's profit from its calculation of the value of the property using Pomykacz' reproduction cost approach.

The trial court's valuation of a property in a property tax appeal is subject to review for abuse of discretion. See, e.g., *Davis* v. *Westport*, 61 Conn. App. 834, 842, 767 A.2d 1237 (2001) (once trial court has found that taxpayer is aggrieved, court has "broad discretionary power to grant appropriate relief"). Although the city has cited authority for the proposition that developer's profit is a proper element of cost when valuing real property, it has cited no evidence that would support a finding that the property's historical cost of $241,949,000, on which Pomykacz based his reproduction cost figures, did not include developer's profit. Thus, although the city contends that the trial court improperly *assumed* that the figure included developer's profit, the trial court reasonably could have concluded, on the basis of the record before it, that Pomykacz simply had assumed that it did not. Accordingly, we conclude that the trial court did not abuse its discretion when it deducted developer's profit of 15 percent from its reproduction cost approach calculations. We emphasize, however, that the city is not precluded from presenting evidence on remand that the historical cost did not include developer's profit, and the court is not precluded from crediting that evidence.

The judgment in the first appeal filed in 2009 is reversed and the case is remanded with direction to deny the city's motion to dismiss and for further proceedings in connection with that appeal; the portion of the judgment in the second appeal filed in 2011 sustaining that appeal on the ground that Wheelabrator was subject to an unlawful tax is affirmed; the portion of the judgment in the second appeal denying the appeal from the valuation of the personal property is affirmed; the portion of the judgment in the second appeal assigning a new valuation to the property is reversed, and the case is remanded for a new trial in the second appeal with respect to that valuation.

In this opinion ROGERS, C. J., and PALMER, EVELEIGH and VERTEFEUILLE, Js., concurred.

[1] All references to the property throughout this opinion are to both the land on which the facility is located and the facility itself.

[2] The complaint in the second appeal refers to Waste To Energy I, LLC. Elsewhere in the record, this entity is referred to as Waste Energy I, LLC. For consistency, we refer to this entity as Waste To Energy.

In the interest of simplicity, we refer to Wheelabrator, the United States Bank National Association, Mogavero and Waste To Energy collectively as Wheelabrator.

[3] Wheelabrator appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] General Statutes § 22a-270 provides in relevant part: "(a) The exercise of the powers granted by this chapter constitute the performance of an essential governmental function and the authority shall not be required to pay any taxes or assessments upon or in respect of a project, or any property or moneys of the authority, levied by any municipality or political subdivision or special district having taxing powers of the state, nor shall the authority be required to pay state taxes of any kind, and the authority, its projects, property and money and any bonds and notes issued under the provisions of this chapter, their transfer and the income therefrom, including revenues derived from the sale thereof, shall at all times be free from taxation of every kind by the state except for estate or succession taxes and by the municipalities and all other political subdivisions or special districts having taxing powers of the state; provided nothing herein shall prevent the authority from entering into agreements to make payments in lieu of taxes with respect to property acquired by it or by any person leasing a project from the authority or operating or managing a project on behalf of the authority and neither the authority nor its projects, properties, money or bonds and notes shall be obligated, liable or subject to lien of any kind for the enforcement, collection or payment thereof. . . .

"(b) Notwithstanding the provisions of subsection (a) of this section, real and personal property owned by the authority may be assessed and taxed against a lessee pursuant to chapter 203 by the municipality in which such property is located if such property is leased as of July 1, 2007, to a lessee or operator by the authority pursuant to an initial site lease entered into between the authority and a lessee on or before December 31, 1985. This subsection shall not apply to property which is: (1) The security for any bonds issued by the authority and outstanding on July 1, 2007, until the indebtedness evidenced by such bonds has been paid in full, (2) leased by the authority pursuant to a lease in effect on January 1, 2007, until after the expiration of the lease term in effect on said date, whether by execution of a new lease, by amendment of the lease or by renewal or extension of the term of such lease pursuant to an option stated therein if such amendment is entered into or such option is exercised after said date, or (3) the subject of an agreement for payments in lieu of taxes between the municipality and the authority or its lessee during any municipal fiscal year covered by such agreement. The lessee shall be liable for taxes assessed pursuant to this subsection and shall have the right to appeal the amount it is assessed in the tax year such property first becomes taxable hereunder in the same manner as a purchaser of formerly tax-exempt property under section 12-81a, with the same effect as if a conveyance to a nonexempt purchaser had been placed on the land records on the date the property first ceases to be exempt pursuant to this section. The assessor and collector of the municipality shall proceed with respect to such property in the same manner as is provided in said section 12-81a with respect to adding the property to the grand list, giving notice of the assessment to the lessee and billing the taxes due thereon to the lessee."

Although § 22a-270 was the subject of technical changes in 2010; see Public Acts 2010, No. 10-32, § 87; those changes have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[5] The trial court ultimately determined that Wheelabrator's appeal from the city's valuations on the 2007 and 2008 grand lists encompassed all valuations up to the date of trial because the 2008 valuation would apply to succeeding years until the property was revalued. Accordingly, the appeal also encompassed the valuation on the city's 2009 grand list even though the complaint did not refer to that valuation.

[6] General Statutes § 12-117a provides in relevant part: "Any person, including any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, claiming to be aggrieved by the action of the board of tax review or the board of assessment appeals, as the case may be, in any town or city may, within two months from the date of the mailing of notice of such action, make application, in the nature of an appeal therefrom, with respect to the assessment list for the assessment year commencing October

1, 1989, October 1, 1990, October 1, 1991, October 1, 1992, October 1, 1993, October 1, 1994, or October 1, 1995, and with respect to the assessment list for assessment years thereafter, to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before said court. . . . The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable, and, if the application appears to have been made without probable cause, may tax double or triple costs, as the case appears to demand; and, upon all such applications, costs may be taxed at the discretion of the court. If the assessment made by the board of tax review or board of assessment appeals, as the case may be, is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes, together with interest and any costs awarded by the court, or, at the applicant's option, shall be granted a tax credit for such overpayment, interest and any costs awarded by the court. Upon motion, said court shall, in event of such overpayment, enter judgment in favor of such applicant and against such city or town for the whole amount of such overpayment, less any lien recording fees incurred under sections 7-34a and 12-176, together with interest and any costs awarded by the court. The amount to which the assessment is so reduced shall be the assessed value of such property on the grand lists for succeeding years until the tax assessor finds that the value of the applicant's property has increased or decreased."

Although § 12-117a was the subject of an amendment in 2013; see Public Acts 2013, No. 13-276, § 5; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of § 12-117a.

[7] General Statutes § 12-119 provides: "When it is claimed that a tax has been laid on property not taxable in the town or city in whose tax list such property was set, or that a tax laid on property was computed on an assessment which, under all the circumstances, was manifestly excessive and could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of such property, the owner thereof or any lessee thereof whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, prior to the payment of such tax, may, in addition to the other remedies provided by law, make application for relief to the superior court for the judicial district in which such town or city is situated. Such application may be made within one year from the date as of which the property was last evaluated for purposes of taxation and shall be served and returned in the same manner as is required in the case of a summons in a civil action, and the pendency of such application shall not suspend action upon the tax against the applicant. In all such actions, the Superior Court shall have power to grant such relief upon such terms and in such manner and form as to justice and equity appertains, and costs may be taxed at the discretion of the court. If such assessment is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes in accordance with the judgment of said court."

[8] The trial court found that CRRA owned the land and leased it to Wheelabrator and that the lease from CRRA to Wheelabrator, Wheelabrator's sublease to the United States Bank National Association and Mogavero, and their sublease back to Wheelabrator had been recorded in the land records. The court apparently concluded, however, that, because Wheelabrator had named Waste To Energy as the owner of the property in the complaint, and because no lease naming Waste To Energy as the owner and Wheelabrator as the lessee had been recorded in the land records, Wheelabrator had failed to plead or to establish that the requirements of §§ 12-117a and 12-119 had been satisfied.

[9] The trial court did not expressly address in its memorandum of decision the issue of Wheelabrator's standing to bring the second appeal. After Wheelabrator filed its appeal to this court from the judgments of the trial court, and the city filed its cross appeal, the city filed a motion for articulation in which it requested, among other things, that the trial court articulate the reason for its denial of the city's motion to dismiss the second appeal. The trial court sustained Wheelabrator's objection to that motion. The city then filed a motion for review with this court in which it requested that this court order an articulation on several issues. This court granted the motion for review in part but denied the motion to the extent that it requested articulation of the trial court's reasons for denying the motion to dismiss the second appeal.

[10] General Statutes § 12-81a (d) provides in relevant part: "The purchaser [of formerly tax-exempt property] may appeal the doings of the assessor to

the board of assessment appeals and the Superior Court as otherwise provided in this chapter . . . ."

[11] It is clear, therefore, that § 22a-270 (b) does not incorporate the requirements of §§ 12-117a and 12-119 relating to lessees of property. If the legislature did not intend that an entity that is a lessee for purposes of § 22a-270 (b) would be deemed to be an owner of the subject property for purposes of appealing from a tax assessment pursuant to §§ 12-117a and 12-119, we cannot fathom under what circumstances or in what sense it could have intended to authorize a lessee "to appeal the amount it is assessed . . . in the same manner as a purchaser of formerly tax-exempt property . . . ." General Statutes § 22a-270 (b).

[12] We note that General Statutes § 12-81 includes tax exemptions for personal property. See, e.g., General Statutes § 12-81 (12) (exempting "[p]ersonal property within the state owned by, or held in trust for, a Connecticut religious organization").

[13] Because we conclude that Wheelabrator had standing to appeal pursuant to § 22a-270 (b), we need not address the issue of whether it has independent standing to appeal pursuant to §§ 12-117a and 12-119 as a "lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of [the] lease to pay real property taxes . . . ." General Statutes § 12-117a; see also General Statutes § 12-119 (referring to "any lessee thereof whose lease has been recorded as provided in section 47-19 and who is bound under the terms of [the] lease to pay real property taxes").

[14] In his written appraisal report, Pomykacz explained that, under the direct capitalization approach, "[o]ne year's income expectancy [is] capitalized at a market derived capitalization rate or at a capitalization rate that reflects a specified income pattern, return on investment, and change in the value of the investment."

[15] Pomykacz explained that, under the reproduction cost approach, an appraiser determines the cost to construct "an exact replica of the facility as it exists with all its quirkiness . . . ." Under the replacement cost approach, the appraiser estimates the cost to build a replacement that would have the "same functionality but . . . a different design."

[16] The trial court appears to have used the phrases "discounted cash flow approach" and "going concern income approach" interchangeably. For example, the court referred to the "[discounted cash flow]/going concern income approach" and concluded that the discounted cash flow approach lacked credibility in part because the experts had "employed the going concern approach rather than directly valuing the real and personal property . . . ." Although the concepts are not identical, they are related. See *Redding Life Care*, *LLC* v. *Redding*, 308 Conn. 87, 95–96 n.9, 61 A.3d 461 (2013) (explaining going concern approach to valuing real estate). Specifically, the discounted cash flow approach is one method of valuing a going concern. See footnote 23 of this opinion.

[17] As we indicated, Wheelabrator's experts' appraised value of the property based on the discounted cash flow approach was $199,300,000, and Pomykacz' appraised value was $376,180,000, a difference of $176,880,000. It is unclear why the trial court found that the difference between their appraisals was greater than $200,000,000.

[18] The trial court explained that, in its view, the problem with the use of the discounted cash flow approach for this particular property was, as Pomykacz explained in his appraisal report, that "[t]raditionally, at commercial properties, such as offices, apartments, malls . . . income is prescribed by leases or the market potential to be leased. There is no such rental market for power generation plants and [waste to energy] facilities. Thus, we were not able to find income that was strictly attributable to the taxable real and personal property, or just the taxable real property. Similar market conditions exist at many properties where the business activities are intertwined with the personal and real property. . . . Appraisers in all of these cases will find it difficult or impossible to find adequate data on the income to the business that is strictly attributable to the real property or the real and personal property." (Internal quotation marks omitted.) We also note that, during trial, the trial court indicated that the use of the income approach to the valuation of the property was "troubling to the court . . . ." The court appeared to suggest that its concern was that it was difficult to distinguish the value of the *business*, which was not subject to property taxes, from the value of the real property, which was. The court noted that an appeal from its decision in another case was pending in this court; see *Redding Life Care*, *LLC* v. *Redding*, 308 Conn. 87, 61 A.3d 461 (2013); and

that the decision in that case "would be a big help to the [trial] court in how the court looks at [the issue of] the use of the income approach . . . ." See footnote 25 of this opinion.

[19] Kettell concluded that the only nontaxable, intangible asset was working capital valued at $2,300,000, whereas Pomykacz concluded that the value of the nontaxable, intangible property—which included computer software, operational and procedural manuals, work force in place and working capital accounts—was $15,498,000.

[20] An haruspex is "a diviner in ancient Rome basing his predictions on inspection of the entrails of sacrificial animals . . . ." Webster's Collegiate Dictionary (11th Ed. 2003); see also The Free Dictionary, available at http://www.thefreedictionary.com/haruspication (last visited January 15, 2016) (defining haruspication as "a form of divination from lightning and other natural phenomena, but especially from inspection of the entrails of animal sacrifices").

[21] Specifically, the trial court rejected the direct capitalization approach because "both appraisers considered [it] to have little merit." The court rejected the replacement cost approach because "the valuation of the subject facility should not be that of a newly constructed modern facility [that] did not exist as of October 1, 2008."

[22] The trial court used October 1, 2008, as the date of valuation because that was the date of the last citywide revaluation.

[23] As we indicated, the trial court used the phrase "going concern" and "discounted cash flow" more or less interchangeably in its memorandum of decision. See footnote 16 of this opinion. The income approach is one specific approach to valuing going concerns; see *Redding Life Care, LLC* v. *Redding*, supra, 308 Conn. 95–96 n.9; and, as the experts in the present case explained, the discounted cash flow approach is one specific form of the income approach. The general tenor of the trial court's memorandum of decision in the present case suggests that the court was troubled generally by the *income approach* to valuing the property, not by the specific *discounted cash flow approach*, per se. See footnote 18 of this opinion. Nevertheless, because the trial court referred repeatedly to the discounted cash flow approach in its memorandum of decision, we use that terminology.

[24] Although the trial court relied on Pomykacz' written report for the proposition that it was difficult to apply the income approach to value real estate that does not have a rental market; see footnote 18 of this opinion; the court did not explain why it rejected Pomykacz' statement, in the very next paragraph of his report, that, after using the income approach to determine the overall business value for the property, he had been able to employ "various appropriate appraisal procedures to discover the value of the taxable real and personal property at the facility. . . . [He had] estimated the value of the nontaxable items and deducted them from the overall business value. Again, this is a standard practice in the valuation of power plants and for waste to energy power plants specifically, and [the] procedures [he employed] are credible."

[25] In *Redding Life Care, LLC*, the trial court, *Aronson, J.*, denied the plaintiff's appeal from the defendant's property tax assessment. See *Redding Life Care, LLC* v. *Redding*, supra, 308 Conn. 93. On appeal to this court, the plaintiff claimed that Judge Aronson improperly had determined that the "going concern income capitalization approach . . . is not recognized or permitted under Connecticut law and thus may not be used to determine the fair market value of real estate . . . ." Id., 94. We concluded, as a matter of law, that "[t]here may be cases in which it is proper to value real estate by first valuing the going concern associated with the property, based on an income capitalization approach, and other cases in which it is not." Id., 96 n.9. We further concluded that Judge Aronson had not rejected the approach as a matter of law but had rejected "the formula and calculations on which [the plaintiff's appraiser] relied to arrive at the valuation of the intangible business." Id., 103. We ultimately affirmed the judgment in that case. Id., 115. In the present case, Judge Aronson referred to our decision in *Redding Life Care, LLC*, in his memorandum of decision, but he never acknowledged this court's statement that the going concern approach may be an appropriate method for valuing property for property tax assessment purposes.

[26] The concurrence states that our conclusion constitutes "a significant departure from the considerable discretion that our case law has long afforded to trial courts with respect to electing the proper appraisal method [to use] in the factual determination of property valuation." We have no quarrel with the proposition, however, that the trial court has broad discretion to choose the proper appraisal method for valuing a particular property,

and nothing in this opinion is to the contrary. Indeed, as the concurrence acknowledges, we certainly have not concluded that the trial court was *required* to use the discounted cash flow approach. We have concluded only that the trial court improperly determined that it could not apply the discounted cash flow approach to properties that do not have a rental market *as a matter of law*.

The concurrence contends, to the contrary, that the trial court concluded only that the discounted cash flow approach " 'lacks credibility' " for this particular property. Although the concurrence cites several reasons that the trial court gave for rejecting the specific calculations of the appraisers, the concurrence has not provided any explanation for the trial court's conclusion that the *approach itself* was inappropriate for this specific property. As we have indicated, the only explanation that we can discern is that the trial court believed that the discounted cash flow approach is inappropriate, as a matter of law, for properties that do not have a rental market. Indeed, one of the reasons that the trial court gave for its rejection of the approach on which the concurrence relies is that the appraisers' estimates pursuant to the discounted cash flow approach were not "a [direct] valuation of the real and personal property [that] are the subject of [the two] appeals . . . ." (Internal quotation marks omitted.) In other words, the trial court concluded that "direct" valuation is the *only* appropriate appraisal method for properties *of this type*. The concurrence also notes that the trial court criticized several of Kettell's specific calculations pursuant to the discounted cash flow approach. As we have indicated, however, even if the trial court had legitimate concerns about certain specific calculations, those concerns were peripheral to the trial court's central conclusion that the approach itself was categorically inappropriate—indeed, that it amounted to nothing more than "haruspication"—for this type of property. Put another way, even if we were to assume that the concurrence is correct that any one of these specific concerns standing alone *could have* provided sufficient reason for the trial court to reject Kettell's calculations, a careful reading of the trial court's memorandum of decision leads us to conclude that these concerns did not provide the *actual* basis for the court's rejection of the discounted cash flow approach. At the very least, it is impossible for us to determine at this juncture whether any of the trial court's specific concerns with Kettell's discounted cash flow calculations, standing alone or in combination, would have led the trial court to adopt the reproduction cost approach if it had not categorically rejected the discounted cash flow approach. To the extent that the concurrence contends that this question is answered by the trial court's articulation, in which the court stated that it "did not reject the [discounted cash flow] approach as a method for valuing the subject property as a matter of law," for the reasons stated in this opinion, we find the concurrence's interpretation of this statement to be inconsistent with the reasoning of the trial court's original memorandum of decision, and we must presume that the trial court may not change the basis for its original decision in an articulation. See *Standish* v. *Standish*, 40 Conn. App. 298, 301, 670 A.2d 1330 (1996) ("[a] motion for articulation is not an opportunity for a trial court to substitute a new decision . . . [for] a prior decision" [internal quotation marks omitted]). We emphasize that we are not concluding that the trial court in fact changed the basis for its decision in the articulation. Rather, we are concluding that the concurrence's *interpretation* of the articulation, namely, that the trial court accepted the general validity of the discounted cash flow approach as applied to the valuation of this type of property but concluded that it was not supported by the evidence in this case, would be inconsistent with the clear meaning of the trial court's original decision. Under our interpretation of the articulation as indicating that the trial court did not believe the experts' testimony that the discounted cash flow approach was appropriate for this type of property, the articulation and the original decision are consistent.

[27] We are mindful, however, that the expert witnesses for *both sides* in the present case testified that the discounted cash flow approach was the best method for valuing the property. If the experts present the same testimony on remand, and the trial court disagrees with that testimony, it should explain why it believes that another approach is preferable.

[28] We address Wheelabrator's claim that the city had unlawfully imposed a double tax on the value of the personal property on the 2010 grand list in part IV of this opinion.

[29] The concurrence concludes that the trial court's conclusion that Pomykacz' calculations did not include personal property was clearly erroneous. It further concludes that a new trial is required at which the trial court should determine whether the appraisal includes the value of the personal property. It is unclear to us why the concurrence, having determined that the trial court properly exercised its discretion to reject the discounted cash

flow approach and to value the property pursuant to the reproduction cost approach, and having reached the " 'definite and firm conviction' that the trial court committed a mistake" when it concluded that Pomykacz' calculations, on which it based its own valuation, did not include personal property, believes that a remand is necessary. Unless the concurrence has other, unstated concerns about the trial court's calculations, it would appear that the concurrence simply could deduct the undisputed value of the personal property from the trial court's valuation to determine the taxable value of the property.

[30] The field card for the property for the 2008 revaluation listed an "Appraised [Building] Value (Card)" of $6,062,840, an "Appraised XF (B) Value [Building]" of $126,360, an "Appraised OB (L) Value [Building]" of $172,320, and an "Appraised Land Value [Building]" of $1,254,000. The total appraised parcel value was $401,624,570. The appraisal report of Wheelabrator's expert witnesses showed that this value was five to ten times the assessed fair market value of Connecticut's five other waste to energy facilities and five times the value that the city had assigned to another electric generating plant located in Bridgeport on the 2008 grand list.

[31] General Statutes § 12-81a (e) provides in relevant part: "[Taxes] shall be due and payable . . . not sooner than thirty days after the date such bill is mailed or handed to the purchaser . . . ."

[32] The city contends that this claim is subject to a separate legal proceeding. Even if that is the case, however, that does not necessarily mean that this evidence was irrelevant to Wheelabrator's general claim in the present case that it is entitled to interest on amounts that it overpaid because the city engaged in a pattern of wrongdoing.

[33] The assessed value of property for tax purposes in Bridgeport is 70 percent of the true and actual value.

[34] General Statutes § 12-62 (b) (2) provides: "When conducting a revaluation, an assessor shall use generally accepted mass appraisal methods which may include, but need not be limited to, the market sales comparison approach to value, the cost approach to value and the income approach to value. Prior to the completion of each revaluation, the assessor shall conduct a field review. Except in a town that has a single assessor, the members of the board of assessors shall approve, by majority vote, all valuations established for a revaluation."

[35] General Statutes § 37-3a (a) provides in relevant part: "Except as provided in sections 37-3b, 37-3c and 52-192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . ."

[36] It is well established that, unlike appeals pursuant to § 12-117a, appeals pursuant to § 12-119 "must [involve] allegations beyond the mere claim that the assessor overvalued the property. [The] plaintiff . . . must satisfy the trier that [a] far more exacting test has been met: either there was misfeasance or nonfeasance by the taxing authorities, or the assessment was arbitrary or so excessive or discriminatory as in itself to show a disregard of duty on their part." (Internal quotation marks omitted.) *Wilson* v. *Kelley*, 224 Conn. 110, 119, 617 A.2d 433 (1992). It does not follow from the fact that a plaintiff is *required* to establish some degree of wrongdoing to bring a claim pursuant to § 12-119, however, that wrongdoing is *irrelevant* to claims brought pursuant to § 12-117a.

[37] General Statutes § 12-113 provides: "The board of assessment appeals may reduce the assessment of any person as reflected on the grand list by reducing the valuation, number, quantity or amount of any item of estate therein, or by deleting any item which ought not to be retained in it, provided any such reduction or deletion shall be recorded in the minutes of the meeting of said board. The board of assessment appeals shall not reduce the valuation or assessment of property on the grand list belonging to any person who does not appear at a hearing before the board of assessment appeals, either in person or by such person's attorney or agent, and offer or consent to be sworn before it and answer all questions touching such person's taxable property situated in the town."

[38] This court in *Wilcox* stated that "[t]he conclusion of the [trial] court that the applicant *has not been aggrieved* by any action of the board of relief was legally and logically drawn from the subordinate facts." (Emphasis added.) *Wilcox* v. *Madison*, supra, 103 Conn. 156. It is clear to us, however, that, by using this language, the court was merely stating that the trial court properly had found that the action of the board of relief was not unlawful, not that the trial court lacked jurisdiction over the plaintiff's claim. See *Sibley* v. *Middlefield*, supra, 143 Conn. 105 ("The court performs a double function on an appeal from a board of tax review. First, it must determine

the judicial question [of] whether the appellant has been aggrieved by such action on the part of the board *as will result in the payment of an unjust and, therefore, a practically illegal tax*. [Second], if that question is answered in the affirmative, the court must proceed to exercise its broad discretionary power to grant relief." [Emphasis added.]).

[39] Because the issues of whether the trial court in a tax appeal pursuant to §§ 12-117a and 12-119 is bound by the decision of a board of assessment appeals when the property owner has failed to appear before the board and to answer its questions and, if so, whether the trial court in the present case was bound by the board's decision because Wheelabrator refused to produce the draft appraisal report were not raised or briefed in this appeal, we express no opinions on those issues. We note, however, that "we have stated on numerous occasions [that], in a § 12-117a appeal, the trial court tries the matter de novo. . . . In a de novo proceeding, the trier of fact makes an independent determination of the matters on which the appeal was taken without regard for the action or decision of the lower tribunal." (Citation omitted.) *Konover* v. *West Hartford*, 242 Conn. 727, 741, 699 A.2d 158 (1997).

[40] General Statutes (Rev. to 2011) § 20-501 (a) provides: "No person shall act as a real estate appraiser or provisional appraiser or engage in the real estate appraisal business without the appropriate certification, license, limited license or provisional license issued by the [Connecticut Real Estate Appraisal] [C]ommission, unless exempted by the provisions of sections 20-500 to 20-528, inclusive."

Hereinafter, all references to § 20-501 are to the 2011 revision unless otherwise noted.

[41] General Statutes (Rev. to 2011) § 20-523 provides: "(a) Any person who engages in the real estate appraisal business without obtaining a certification, license, limited license or provisional license, as the case may be, as provided in sections 20-500 to 20-528, inclusive, shall be fined not more than one thousand dollars or imprisoned not more than six months or both, and shall be ineligible to obtain a certification, license, limited license or provisional license for one year from the date of conviction of such offense, except the [Connecticut Real Estate Appraisal] [C]ommission, in its discretion, may grant a certification, license, limited license or provisional license, as the case may be, to such person within such one-year period upon application and after a hearing on such application.

"(b) No person who is not certified, licensed, limited licensed or provisionally licensed, as appropriate, by the commission as a real estate appraiser shall represent himself or herself as being so certified, licensed, limited licensed or provisionally licensed or use in connection with such person's name or place of business the term 'real estate appraiser', 'real estate appraisal', 'certified appraiser', 'certified appraisal', 'residential appraiser', 'residential appraisal', 'limited licensed appraiser', 'provisional appraiser' or 'provisional appraisal' or any words, letters, abbreviations or insignia indicating or implying that such person is a certified, licensed, limited licensed or provisionally licensed, as appropriate, real estate appraiser in this state. Any person who violates the provisions of this subsection shall be fined not more than one thousand dollars or imprisoned not more than six months, or both."

Hereinafter, all references to § 20-523 are to the 2011 revision unless otherwise noted.

[42] General Statutes (Rev. to 2007) § 20-500 (5) provides: " 'Engaging in the real estate appraisal business' means the act or process of estimating the value of real estate for a fee or other valuable consideration."

General Statutes (Rev. to 2007) § 20-500 (5) is now codified at General Statutes § 20-500 (11).

[43] The city contends that *Taylor* and *Hutchinson* are distinguishable because in neither case did the expert witness claim to be a real estate appraiser. We are not persuaded. If a person who does not claim to be a real estate appraiser may testify as an expert witness regarding the value of real estate, we cannot perceive why a person who claims to have special skills and knowledge in the appraisal of real estate should be barred from testifying merely because the person is not licensed.

[44] We also note that, although the city has acknowledged that there are cases in which persons who are not licensed to appraise real estate have testified as expert witnesses regarding the value of real property, it has referred to no case in which the state has prosecuted such persons.